[947 NE2d 1155, 923 NYS2d 377]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OLL-
MAN LOPEZ, Appellant.

Argued January 6, 2011; decided February 22, 2011

## POINTS OF COUNSEL

*Legal Aid Society*, New York City (*Svetlana M. Kornfeind* and *Steven Banks* of counsel), for appellant. Appellant's statement was introduced at trial in violation of his right to counsel, where appellant was in continuous custody on a pending drug case on which he had an attorney, but the detective who was investigating an unrelated homicide deliberately avoided asking appellant about his possible representation in the custodial case before eliciting a waiver of his rights. (*People v Hobson*, 39 NY2d 479;

*People v Rogers*, 48 NY2d 167; *People v Burdo*, 91 NY2d 146; *People v Steward*, 88 NY2d 496; *People v Bing*, 76 NY2d 331; *People v Kazmarick*, 52 NY2d 322; *People v Cunningham*, 49 NY2d 203; *People v Carranza*, 3 NY3d 729; *People v Garofolo*, 46 NY2d 592; *People v Pinzon*, 44 NY2d 458.)

*Daniel M. Donovan, Jr., District Attorney*, Staten Island (*Morrie I. Kleinbart* of counsel), for respondent. Defendant's state constitutional right to counsel was fully respected. (*People v Burdo*, 91 NY2d 146; *People v Arthur*, 22 NY2d 325; *People v Samuels*, 49 NY2d 218; *People v West*, 81 NY2d 370; *People v Cunningham*, 49 NY2d 203; *People v Hobson*, 39 NY2d 479; *People v Cohen*, 90 NY2d 632; *People v Rogers*, 48 NY2d 167; *People v Robles*, 72 NY2d 689; *People v Kazmarick*, 52 NY2d 322.)

**OPINION OF THE COURT**

GRAFFEO, J.

Under New York's indelible right to counsel rule, a defendant in custody in connection with a criminal matter for which he is represented by counsel may not be interrogated in the absence of his attorney with respect to that matter or an unrelated matter unless he waives the right to counsel in the presence of his attorney (*see People v Rogers*, 48 NY2d 167 [1979]). In this case, we must determine whether the rule applies even if the interrogator is unaware that an incarcerated defendant is represented by an attorney. We conclude that if it is reasonable for an interrogator to suspect that an attorney may have entered the custodial matter, there must be an inquiry regarding the defendant's representational status and the interrogator will be charged with the knowledge that such an inquiry likely would have revealed.

I

In early 2002, Hamoud Thabeat was murdered in his Staten Island bodega. The case remained unsolved for some time until an individual came forward and informed the police that defendant Ollman Lopez had shot Thabeat. The informant explained that, shortly after the shooting, he was talking to a group of young men in the neighborhood about this incident. He claimed that, during the conversation, defendant had laughed and stated that he had shot the store owner. The informant further identified defendant (whom he had known for years) from a photo array.

After receiving this information, the investigating officer, Detective Mattei, interviewed one of the young men who had been present during the conversation reported by the informant. This individual recalled that, on the day of the killing, either defendant or Jonah Alston had suggested that they rob a store. Later that day, defendant admitted to his friends that he had shot the store owner. Another acquaintance of defendant who had been with him that day told Mattei that Alston claimed defendant had killed Thabeat and that defendant confirmed that he was the shooter. Based on these interviews, Mattei spoke to Alston, who confessed in a videotaped interview that he had accompanied defendant to the bodega to commit a robbery and that defendant had shot Thabeat. The other young men who cooperated with the police were not involved in the underlying crime.

Detective Mattei eventually learned that defendant was incarcerated in Pennsylvania on a drug charge. The Pennsylvania authorities told Mattei that defendant was in custody because he was unable to post his $10,000 bail. Mattei traveled to the correctional facility where defendant was jailed to speak to him about the Staten Island homicide. Mattei was not informed about the details of the Pennsylvania crime and he did not inquire about them. Unbeknownst to the detective, defendant was represented by an attorney in connection with the Pennsylvania offense.

When allowed to meet with defendant, Detective Mattei issued *Miranda* warnings to him, advised defendant that he did not want to discuss the Pennsylvania matter and indicated that he was investigating the Staten Island murder. Mattei inquired if defendant wanted to speak to an attorney about the New York case and defendant responded that he did not. In the course of the interview, Mattei played a portion of Alston's taped confession, after which defendant acknowledged that he had been involved in the robbery but claimed that Alston was the shooter. Defendant signed a written statement to that effect.

After Mattei's interview and while defendant remained incarcerated, he discussed his role in the Staten Island murder with another inmate. Defendant disclosed to that inmate that he had shot the deli owner during the botched robbery. Defendant further stated that he told Detective Mattei that his accomplice was the shooter because he planned to use his sister as an alibi witness, intending to claim that he was at her house when Thabeat was shot. The inmate related this conversation to his

lawyer and this information was eventually provided to the New York prosecutor handling the Staten Island matter.

For his role in the killing of Thabeat, defendant was indicted for felony murder in the second degree, intentional murder in the second degree, three counts of attempted robbery in the first degree and criminal possession of a weapon in the second and third degrees.[1] Defendant moved to suppress his confession to Detective Mattei, asserting that his right to counsel had been violated when Mattei questioned him about the Staten Island murder without first obtaining a waiver of his right to counsel in the presence of his Pennsylvania attorney. During the suppression hearing, Mattei testified that he did not know that a lawyer was representing defendant on the Pennsylvania charge, nor did he ask about it. Supreme Court denied defendant's motion, concluding that the right to counsel did not attach because Mattei lacked actual knowledge of the attorney's involvement in the Pennsylvania matter. Following a jury trial, defendant was convicted of intentional murder, felony murder, attempted robbery in the first degree and criminal possession of a weapon in the second degree.[2] He was sentenced to a prison term of 25 years to life.

The Appellate Division affirmed the conviction (65 AD3d 1166 [2d Dept 2009]), holding that, although defendant was represented by a lawyer on the charge for which he was in custody in Pennsylvania, the indelible right to counsel was not implicated because the interviewing detective was not aware that defendant had a lawyer in Pennsylvania. A Judge of this Court granted leave to appeal (13 NY3d 908 [2009]) and we now affirm on different grounds.

## II

Relying on *People v Burdo* (91 NY2d 146 [1997]), defendant contends that his confession should have been suppressed because he was in police custody when Detective Mattei interviewed him, his indelible right to counsel had attached upon assignment of a lawyer on the Pennsylvania charge and Mattei did not secure a valid waiver of that right before questioning him. The People disagree and maintain that the right to counsel did not attach because Mattei did not have

---

**1.** Alston was named as a codefendant in the felony murder and attempted robbery counts.

**2.** Alston was tried separately and convicted of felony murder and related offenses.

actual knowledge that defendant was represented on the Pennsylvania matter. The People also assert that recognition of a right to counsel under these circumstances will resurrect the discredited "derivative right to counsel" rule of *People v Bartolomeo* (53 NY2d 225 [1981]).

New York has long viewed the right to counsel as a cherished and valuable protection that must be guarded with the utmost vigilance (*see e.g. People v Harris*, 77 NY2d 434, 439 [1991]). Arising from the due process guarantee in our State Constitution, the entitlement to effective assistance of counsel and the privilege against compulsory self-incrimination, the right to counsel is referred to as "indelible" because, once it "attaches," interrogation is prohibited unless the right is waived in the presence of counsel (*see People v Bing*, 76 NY2d 331, 338-339 [1990]). We have explained that attachment occurs when (1) a person in custody requests the assistance of an attorney or a lawyer enters the case or (2) a criminal proceeding is commenced against the defendant by the filing of an accusatory instrument (*see People v West*, 81 NY2d 370, 373-374 [1993]). We are concerned only with actual representation for the purposes of this appeal.

When an attorney enters a case to represent the accused, the police may not question the accused about that matter regardless of whether the person is in police custody (*see People v West*, 81 NY2d at 375). If, however, the police seek to question the suspect about a matter that is not related to the case that the attorney is handling, different rules apply (*People v West*, 81 NY2d at 377). In the seminal case of *People v Rogers* (48 NY2d 167 [1979]), we established that an individual who is in custody for an offense and is represented by counsel on that case may not be questioned about any matter—related or unrelated to the crime for which there is legal representation—unless the accused validly waives the right to counsel (*see People v Rogers*, 48 NY2d at 169). Simply put, the *Rogers* rule states that the indelible right to counsel activates the moment that an attorney becomes involved (*see id.* ["once an attorney has entered the proceeding . . . a defendant in custody may not be further interrogated in the absence of counsel"]; *People v Steward*, 88 NY2d 496, 501 [1996] ["*Rogers* establishes and still stands for the important protection and principle that once a defendant in custody on a particular matter is represented by or requests counsel, custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is

sought or obtained, must cease"]). The issue of the extent of police knowledge was not addressed in *Rogers* because the interrogating officers in that case had been directly informed by Rogers' lawyer that they could not question him after he was taken into custody (*see* 48 NY2d at 170).

In *People v Burdo* (91 NY2d 146 [1997]), we applied the *Rogers* rule to a situation where the defendant was incarcerated for rape, had been assigned an attorney for that charge and the police were aware of counsel's involvement. The police sought to question the defendant about a missing person—a matter unrelated to the rape—and, outside the presence of his attorney, he declined to consult a lawyer about the new matter. We held that *Rogers* prohibited the police from inquiring about the missing person, specifically noting that, as in *Rogers*, the police were "fully aware" that the defendant was represented on the matter for which he was in custody (*id.* at 150). The case now before us is distinguishable from these precedents because Detective Mattei testified that he was not aware that defendant was represented by an attorney on the Pennsylvania drug charge.[3]

In deciding whether *Rogers* and *Burdo* should direct the outcome here, we are mindful of several overarching principles that have guided the development of New York's indelible right to counsel rules. Our jurisprudence in this area "has continuously evolved with the ultimate goal of 'achieving a balance between the competing interests of society in the protection of cherished individual rights, on the one hand, and in effective law enforcement and investigation of crime, on the other' " (*People v Grice*, 100 NY2d 318, 322-323 [2003], quoting *People v Waterman*, 9 NY2d 561, 564 [1961]). Consequently, the parameters of the indelible right to counsel are defined "through the adoption of 'pragmatic and . . . simple[ ] test[s]' (*People v Failla*, 14 NY2d 178, 181 [1964]) grounded on 'common sense and fairness' (*People v Bing*, 76 NY2d at 339)" (*People v Grice*, 100 NY2d at 323) in order to "provid[e] an objective measure to guide law enforcement officials and the courts" (*People v Robles*, 72 NY2d 689, 699 [1988]).

---

**3.** This case also differs from *Burdo* because defendant was not incarcerated in New York when he was questioned and Pennsylvania does not recognize an indelible right to counsel to the extent that we do in New York (*see generally Commonwealth v Yarris*, 519 Pa 571, 593-594, 549 A2d 513, 524-525 [1988]). We have previously held that the interrogation of a defendant by a New York law enforcement agent outside of this state is subject to our right to counsel jurisprudence (*see People v Bing*, 76 NY2d at 344-345).

For over three decades, *"Rogers* has stood as a workable, comprehensible, bright line rule, providing effective guidance to law enforcement while ensuring that it is defendant's attorney, not the police, who determines which matters are related and unrelated to the subject of the representation" *(People v Burdo,* 91 NY2d at 151). The *Rogers* rule is eminently straightforward: when an attorney undertakes representation in a matter for which the defendant is in custody, all questioning is barred unless the police obtain a counseled waiver. *Rogers* therefore requires inquiry on three objectively verifiable elements—custody, representation and entry *(see e.g. People v Burdo,* 91 NY2d at 149; *People v Steward,* 88 NY2d at 502; *People v West,* 81 NY2d at 377; *People v Bing,* 76 NY2d at 350).

In this case, defendant was in custody pending prosecution on Pennsylvania charges and he was represented by a Pennsylvania attorney who had entered that case. The only remaining question is whether Detective Mattei should have been deemed chargeable with knowledge of that representation and entry. In *People v Kazmarick* (52 NY2d 322, 328 [1981]), we recognized that there may be circumstances in which "law enforcement officials may . . . be chargeable with knowledge that [a] defendant is in fact represented by counsel . . . on an unrelated charge, in such a way as to cut off their rights to interrogate." More recently, we explained that "either actual or constructive knowledge by interrogating police officers suffices to perpetuate the indelible right to counsel once attached" *(People v Bongarzone-Suarrcy,* 6 NY3d 787, 789 [2006]). We have also applied a constructive knowledge rationale in a situation where an attorney communicated with the police agency that has custody of a suspect, but the interrogating officer was not aware of that communication *(see People v Pinzon,* 44 NY2d 458, 463-464 [1978]; *see generally People v Carranza,* 3 NY3d 729, 730 [2004]).

■ We believe that imputation of constructive knowledge is appropriate under the facts of this case as well. In our view, society's interest in protecting individual constitutional rights would be devalued if the police were allowed to question an incarcerated individual under circumstances where it would be reasonable for the interrogating officer to expect that it is highly likely that the accused has an attorney on the custodial matter. Permitting a police officer to remain deliberately indifferent—avoiding any inquiry on the subject notwithstanding the nature of the custodial charges and the likelihood that a lawyer has entered the matter—in order to circumvent the protection

afforded by *Rogers* is not only fundamentally unfair to the rights of the accused, it further undermines the preexisting attorney-client relationship that serves as the foundation of the *Rogers* rule. A contrary holding would allow a police officer who is fairly certain that an attorney is involved in the custodial matter to flout *Rogers* by claiming that he was not fully confident about a lawyer's involvement. For these reasons, we hold that an officer who wishes to question a person in police custody about an unrelated matter must make a reasonable inquiry concerning the defendant's representational status when the circumstances indicate that there is a probable likelihood that an attorney has entered the custodial matter, and the accused is actually represented on the custodial charge.

The circumstances of this case readily demonstrate the necessity of this principle. Detective Mattei was aware of several facts that would have led a police officer to reasonably conclude that it was highly likely that defendant had legal representation on the Pennsylvania charge. Specifically, defendant was incarcerated on a drug charge for transporting narcotics into that state and was being held in lieu of $10,000 bail. The fact that bail had been set indicated that defendant had been arraigned in court on the charge. Arraignment undoubtedly signified that defendant's right to counsel had attached—whether under the Sixth Amendment to the United States Constitution (*see e.g. Fellers v United States*, 540 US 519, 523 [2004]), Pennsylvania law (*see e.g. Commonwealth v Gwynn*, 596 Pa 398, 410, 943 A2d 940, 948 [2008]) or the New York Constitution (*see Hurrell-Harring v State of New York*, 15 NY3d 8, 20 [2010])—and made it probable that defendant had been assigned or had retained an attorney, which was true in this case. Under these circumstances, Mattei should have resolved any doubt that may have remained by inquiring about defendant's representational status, rather than avoiding the topic, before commencing interrogation about the Staten Island murder and eliciting the incriminating statements.[4] Since it is likely that a reasonable inquiry would have revealed counsel's involvement, the detective is chargeable with that knowledge and defendant's indelible right to counsel was violated because the questioning was not preceded by a valid waiver.

---

4. Had the detective asked defendant directly and he denied having an attorney for the Pennsylvania case, we have no doubt that Mattei could have accepted that assertion at face value if it would have been reasonable to do so (*see generally People v Lucarano*, 61 NY2d 138, 148 [1984]).

Our holding does not, as the People claim, resurrect *People v Bartolomeo* (53 NY2d 225 [1981]). That decision expanded the prohibition on interrogation regarding unrelated matters by creating a "derivative right to counsel" that attached to a new criminal offense whenever a suspect was represented by counsel in connection with unrelated pending charges and regardless of whether the suspect was in custody on the pending charges. The derivative right was fictional because it presumed the existence of an attorney-client relationship in connection with the new, unrelated matter even though the accused was not actually represented by an attorney in the new case. Because *Bartolomeo* proved to be unworkable, it was overruled by *People v Bing* (76 NY2d at 350) and the derivative right no longer exists (*see People v Steward*, 88 NY2d at 500). In contrast, here, defendant was in custody for an offense for which he had representation and, as such, his right to counsel on that crime had "attached indelibly" (*People v West*, 81 NY2d at 379). Thus, in the absence of a valid waiver, *Rogers* precluded questioning about the unrelated homicide while defendant remained in custody on the Pennsylvania charge.

Accordingly, we conclude that defendant's indelible right to counsel was violated because the discussion about the Staten Island murder occurred while he was in custody for the Pennsylvania offense, the interrogating detective is chargeable with knowledge that an attorney had entered the case to represent him on the Pennsylvania matter and a valid waiver was not secured from defendant before questioning commenced.

### III

The concurrence expresses the view that this Court's right to counsel jurisprudence is too complicated and that we should limit *Rogers* to its facts. It recommends that the better course would be to overrule *Bing*, *West*, *Steward*, *Burdo* and the many cases that have relied on those decisions—and return to the more restrictive rule articulated in *People v Taylor* (27 NY2d 327 [1971]).[5] Under *Taylor*, the police were allowed to interrogate a person who was in custody and represented by an attorney who had entered the case about any matter unrelated to the custodial charge.

---

5. The parties in this appeal have neither questioned the continuing viability of *Rogers* and its progeny nor suggested that we should retreat to the *Taylor* rule. Furthermore, stare decisis dictates that prior decisions are entitled to significant deference and may be overruled only when there is a compelling justification for doing so.

We disagree with our concurring colleagues because *Rogers* offered several persuasive reasons for recognizing a right to counsel that extended beyond *Taylor*. The *Rogers* rule provides an extra measure of protection to the attorney-client relationship when a defendant is in custody on a represented charge in recognition of the fact that the right to counsel is "a shield against the awesome and sometimes coercive force of the State" (48 NY2d at 173). Moreover, *Rogers* explained that "it is the role of [the] defendant's attorney, not the State, to determine whether a particular matter will or will not touch upon the extant charge" and "the attorney's function cannot be negated by the simple expedient of questioning in his absence" (*id.*). The concurrence does not question the validity of this reasoning.

The path we have taken in right to counsel cases may have been bumpy at times and the concurrence understandably questions the continuing validity of some of the rationales used by this Court in *Rogers*, *Bartolomeo* and *Bing*. But the conclusion we reach today is consistent with the holdings in those decisions and our other undisturbed precedent.

*Rogers* was correctly decided because the defendant was in custody for an offense for which he was actually represented by a lawyer who had entered the case and communicated his representation to the police. In contrast, in *Bartolomeo* the defendant was in custody for an offense but he did not have counsel on that charge. He did, however, have legal representation in connection with a prior, unrelated criminal case. We erred in *Bartolomeo* by inferring a fictional attorney-client relationship on the matter for which he was in custody. The feature that distinguishes the two cases is whether the defendant was in custody for an offense with actual representation on that charge and notification to the police.

The issue of police custody was also a pivotal concern in *Bing* and *Cawley* (a companion case to *Bing*). Neither defendant was in custody for the offense for which an attorney had entered. Bing and Cawley were under arrest for being fugitives from justice but they were not represented by counsel on that matter when the incriminating statements were elicited.[6] Both cases are distinguishable from this appeal because defendant Lopez

---

6. The concurrence states that Bing and Cawley "were in custody on charges for which they had lawyers" (concurring op at 393). This is not so. The record in *Bing* reveals that Bing had been arrested in Ohio for burglary, arraigned, assigned counsel and released on bail. He then fled from that state,

was in custody for the Pennsylvania offense and an attorney had entered that proceeding before Detective Mattei began the interrogation. If defendant had made bail on the Pennsylvania charge and been released, or if he had been released and was arrested on a fugitive warrant for failure to appear, he could have been questioned about an unrelated matter, just as Bing and Cawley were.

As we have explained, both *Rogers* and today's decision are premised on the fact that the right to counsel was violated on the particular matter for which the defendant was in custody. In *Rogers*, the defendant was in custody for a robbery and his right to counsel on that charge was violated when the police continued to question him and elicited the incriminating statement. So too, in *Burdo*, the defendant was in custody for rape when he was questioned about a missing person and we held that his right to counsel on the rape (not the murder) had been violated. Similarly, defendant in this case was in custody for the Pennsylvania drug charge and his right to counsel on that offense (not the murder) was violated when Detective Mattei questioned him about the Staten Island homicide.

In sum, the holding here is consistent with *Bing* and *Cawley*, and we see no compelling basis to overrule *Rogers* and its progeny.

## IV

A violation of the indelible right to counsel does not automatically constitute reversible error. Instead, it is reviewed under the harmless error doctrine for constitutional violations (*see e.g. People v West*, 81 NY2d at 373; *People v Krom*, 61 NY2d 187, 201 [1984]; *People v Flecha*, 60 NY2d 766, 767 [1983]; *People v Sanders*, 56 NY2d 51, 66-67 [1982]; *People v Rogers*, 48 NY2d at 174). Errors of this type "are considered harmless when, in light of the totality of the evidence, there is no reasonable possibility that the error affected the jury's verdict" (*People v*

---

for which an arrest warrant was issued. Bing therefore knew that he was wanted in Ohio when he was apprehended by the police in New York. He was under arrest in this state for violating the terms of his bail in Ohio, not for committing the burglary. Similarly, Cawley had been arrested for robbery, released on his own recognizance and later absconded. This resulted in the issuance of a bench warrant for his arrest, which served as the predicate for his incarceration at the time he was questioned by the police. The *Bing* Court viewed these arrests in New York as separate from the prior charges for which the defendants had legal representation, placing them beyond the reach of the *Rogers* rule.

*Douglas*, 4 NY3d 777, 779 [2005]; *see People v Crimmins*, 36 NY2d 230, 240-241 [1975]). If no such possibility exists, the error is deemed to be harmless beyond a reasonable doubt (*see People v Goldstein*, 6 NY3d 119, 129 [2005]).

■ Here, there is no reasonable possibility that the introduction of defendant's improperly obtained statement to Detective Mattei affected the conviction in light of the other evidence that overwhelmingly established that defendant murdered Hamoud Thabeat. The People's proof demonstrated that defendant had spontaneously and unequivocally told at least three acquaintances that he shot Thabeat during the failed robbery. None of these individuals had any apparent motive to lie about defendant's admissions. The information these individuals conveyed to law enforcement was independently obtained and their testimony was strongly corroborative.

Particularly, three of the young men who had been with defendant on the day the shooting occurred provided the jury with consistent and specific details about their activities that day (e.g., drinking alcohol, smoking marijuana and playing video games, as well as information regarding who had entered and exited the house). Two of them testified that defendant had confessed to shooting two bullets at Thabeat and remarked that nothing was stolen from the store. One of the men further testified that defendant said he had used a revolver to shoot Thabeat in the chest. None of these companions had been with defendant at the scene of the shooting.

Defendant's admissions to his friends were confirmed by other evidence at trial. A medical examiner testified that Thabeat had been hit by two bullets and that the fatal shot was to the chest. Police officers who responded to the crime scene testified that nothing had been disturbed in the store and money remained in the cash register. A ballistics expert concluded that the recovered bullet was a .38 caliber and "definitely" had been fired from a revolver. Expert testimony explained that the lack of bullet casings at the scene of the killing was because revolvers, unlike semi-automatic handguns, do not automatically eject shell casings when fired. All of this forensic evidence supported the testimony of defendant's companions.

In addition, while defendant was incarcerated in Pennsylvania, he confessed to another inmate that he had killed the store owner and had lied to the police when he told them that Alston was the shooter. He also described to the inmate how he planned

to use his sister to establish a false alibi. The only conceivable source of this information had to be defendant himself.[7]

Considered in its totality, this evidence was overwhelming and it effectively narrowed the scope of the central question that was before the jury: whether defendant or Jonah Alston was the shooter. In this regard, defendant's jailhouse statement to Detective Mattei was, in a sense, partially exculpatory since he claimed that Alston murdered Thabeat and that he was merely a passive participant in the robbery gone awry. Since the jury found defendant guilty of shooting Thabeat, it necessarily disbelieved what he told Mattei and thereby diminished the importance of the improperly obtained statement in the overall context of the case. Moreover, defendant did not present to the jury any theory that cast significant doubt upon his guilt. For all of these reasons, we find that the violation of defendant's indelible right to counsel was harmless beyond a reasonable doubt.

Accordingly, the order of the Appellate Division should be affirmed.

SMITH, J. (concurring). Over the last several decades, we have described the New York right to counsel that we have created as "pragmatic," "simple," "grounded on 'common sense and fairness'," "workable" and "comprehensible." The majority quotes all these descriptions today and adds that the law is "eminently straightforward" (see majority op at 381, 382, 383 [and the authorities there cited]).

I think we protest too much. In reality, our right to counsel jurisprudence is so complicated that it is almost incomprehensible, and it regularly produces unjust results. This case is an example. The majority, struggling to harmonize our cases—an attempt which, as I will try to show, does not succeed—is led to the conclusion that Detective Mattei infringed defendant's right to a lawyer. But it is hard to imagine any case in which a prisoner's waiver of that right could be more free of coercion, deception or any other form of unfairness. The majority finds the waiver bad because Mattei should have realized that a Pennsylvania lawyer was representing defendant on a drug charge completely unrelated to the murder Mattei was investigating; in common sense, the Pennsylvania case should have no bearing at all on the validity of defendant's waiver.

---

7. The Pennsylvania informant received no tangible reward for his testimony aside from the New York prosecutor's offer to write a letter to Pennsylvania authorities acknowledging his assistance in this case.

The majority's attempt to reconcile the cases fails because no satisfactory reconciliation is possible. I therefore propose that we simplify our law by limiting *People v Rogers* (48 NY2d 167 [1979]) to its facts, and returning to the old-time religion of *People v Taylor* (27 NY2d 327 [1971]). *Taylor*, unlike *Rogers* and more recent cases, did establish a simple, workable rule: that a suspect's relationship with a lawyer in one case does not bar police questioning of him about another, unrelated case.

The facts of *Rogers*, the case in which we abandoned the *Taylor* rule, were these: Defendant was arrested as a suspect in a robbery. After he had been questioned about that robbery for two hours, a lawyer entered the case on his behalf and asked the police to stop questioning him. They did not stop, but changed the subject: They questioned him—for four more hours, in which he was manacled to a chair—about "unrelated activities in which he had not participated" (48 NY2d at 170). After this, the defendant, for reasons unclear in the *Rogers* opinion, "uttered an inculpatory statement" *about the original crime* (*id.*).

It is easy to see why we did not like what happened in *Rogers*, and I would have no quarrel with a rule excluding a defendant's statement on facts like those; perhaps a rule providing that, where a defendant is represented by counsel on a particular matter, any statement *about that matter* that is elicited by police questioning in counsel's absence is inadmissible. But in *Rogers*, unfortunately, we went much further, saying that "once a defendant is represented by an attorney, the police may not elicit from him any statements, except those necessary for processing or his physical needs" (48 NY2d at 173). Under this rule, statements about a new case in which defendant never had a lawyer can be excluded.

This has led—and is still leading, more than 30 years later—to much trouble and confusion. In *People v Bartolomeo* (53 NY2d 225, 229 [1981]) we held that

> "[w]here to the knowledge of the interrogating officer a suspect being questioned had been arrested by the same law enforcement agency nine days previously on an unrelated charge, statements obtained in consequence of the interrogation must be suppressed if in fact the suspect is represented by an attorney with respect to the unrelated charge even though the fact of such representation is unknown to the officer."

Nine years later, we decided that we had gone too far, and overruled *Bartolomeo* in *People v Bing* (76 NY2d 331 [1990]). We explained in *Bing*:

> "The right to assistance of counsel is one of the important means of protection against police harassment afforded individuals. But the right recognized must rest on some principled basis which justifies its social cost. *Bartolomeo* has no such basis. It rests on a fictional attorney-client relationship derived from a prior charge and premised on the belief that a lawyer would not refuse to aid his newly charged client. The decision to retain counsel rests with the client, however, not the lawyer and by hypothesis *Bartolomeo* defendants have waived their right to counsel and chosen not to hire a lawyer to represent them on the new unrelated charges. Indeed, they have done so after receiving the benefit of legal advice and after at least one prior experience dealing with the authorities." (*Id.* at 348-349 [citation omitted].)

The above language (and much else in the *Bing* opinion) reads like an argument for overruling not only *Bartolomeo* but the broad rule of *Rogers*. In the typical case to which the *Rogers* rule applies—this one, for example—the suspect's assumed representation by counsel on a second, unrelated case is "a fictional attorney-client relationship derived from a prior charge." In this and similar cases, it is no less true than in *Bartolomeo* that "defendants have waived their right to counsel and chosen not to hire a lawyer to represent them on the new unrelated charges"—and, indeed, that they "have done so after receiving the benefit of legal advice and after at least one prior experience dealing with the authorities."

Despite this, *Bing* did not reject the rule of *Rogers*—the *Bing* majority opinion ends, surprisingly, with a declaration that *Rogers* is still good law:

> "We emphasize in closing that although *Rogers* and *Bartolomeo* are frequently linked in legal literature and *Rogers* was the only case cited to support the new rule adopted in *Bartolomeo*, the two holdings are quite different. In *People v Rogers*, the right to counsel had been invoked on the charges on which defendant was taken into custody and he and his

counsel clearly asserted it. To protect his rights, we established a bright-line rule preventing the police from questioning defendant about those charges or any other charges. In *People v Bartolomeo*, however, defendant was taken into custody for questioning on a new, unrelated charge. He was not represented on that charge and freely waived his right to counsel. Since the right to counsel is personal and may be waived by a defendant, the court had to create an indelible right, a right that defendant could not waive in the absence of counsel, to justify suppression of the voluntary statement. It did so by implying a derivative right arising from the prior pending charges. We find the *Bartolomeo* rule unworkable, and therefore overrule it, but our decision today should not be understood as retreating from the stated holding of *Rogers*." (*Id.* at 350 [citations omitted].)

It has never been entirely clear what the *Bing* court thought distinguished *Rogers* and *Bartolomeo*: What made *Rogers* right and *Bartolomeo* wrong? A possible distinction is that *Bartolomeo* went beyond *Rogers* by prohibiting questioning not only where the police actually knew of a prior representation, but where they could readily have discovered it. In *Bartolomeo* itself, both the majority and the dissent emphasized that point. The words "even though the fact of such representation is unknown to the officer" are part of the *Bartolomeo* majority's statement of its holding (quoted above), while the dissent stressed "that the police knew only that defendant had been previously arrested and did not know defendant had counsel on those earlier charges" (53 NY2d at 236 [Wachtler, J., dissenting]). Three years after the *Bing* decision, in *People v West* (81 NY2d 370 [1993]), we said that this was indeed what distinguished *Rogers* and *Bartolomeo*. According to *West*, the "*Bartolomeo* right was problematic" because "[u]nlike *Rogers*, the *Bartolomeo* right could attach without police awareness of the unrelated representation" (*id.* at 378).

The majority today criticizes the idea of giving dispositive weight to the distinction between a police officer's actual knowledge and that which a reasonable officer would think "highly likely" (majority op at 383). The criticism is cogent. I agree that in this case, Detective Mattei, if he thought about the question at all, would probably have assumed that defendant had counsel

on the pending Pennsylvania charge, and it seems arbitrary to make the case turn on whether that assumption ripened into actual knowledge. But for me, the point of greater importance is that there is no reason why either the assumption or the knowledge should have prevented Mattei from asking questions about a matter having nothing to do with the Pennsylvania case.

If actual knowledge does not suffice to distinguish *Rogers* and *Bartolomeo* (and thus to justify *Bing*'s overruling of one case but not the other), what is the distinguishing feature? Today's majority suggests that it is the occasion for the suspect's custody. Rogers, when questioned by the police, was in custody on the charge on which a lawyer represented him; Bartolomeo was in custody on a later charge, on which he was unrepresented. Indeed, the language I have already quoted from *Bing* points out that in *Rogers* "the right to counsel had been invoked on the charges on which defendant was taken into custody." And in *People v Steward* (88 NY2d 496, 499 [1996]) we seemed to embrace the "custody" rationale, saying that the distinguishing feature of the *Bartolomeo* right was that "it did not hinge on or relate to the matter for which a defendant was then in custody and being questioned."

But the "custody" explanation of *Bing*'s distinction between *Rogers* and *Bartolomeo* cannot be the correct one, for a simple reason: It fails to account for the result in *Bing* itself, and in *People v Cawley*, decided with *Bing*. Bing was arrested in New York on an Ohio warrant, at a time when he had counsel on the Ohio charge. While in custody on that charge in New York, he was questioned about and admitted involvement in an unrelated burglary. Cawley was arrested for robbery, jumped bail and was rearrested on a bench warrant. Thus, he was in custody on the original robbery charge when he "gave inculpatory statements about new, unrelated criminal conduct" (76 NY2d at 336). If custody was the basis for the line that *Bing* drew between *Rogers* and *Bartolomeo*, why were Bing's and Cawley's statements not suppressed? My predecessor on this Court asked essentially this question 14 years ago, and received no answer (*see People v Burdo*, 91 NY2d 146, 154-155 [1997, Wesley, J., dissenting]).

Today's majority attempts to answer the question, but its answer does not work. It says that Bing and Cawley were not "in custody for the offense for which an attorney had entered" but "were under arrest for being fugitives from justice" and "were not represented by counsel on that matter" (majority op

at 385). But being a fugitive from justice is not a separate "matter" from the offense that caused the fugitive to flee. Bing and Cawley fled to avoid facing, were arrested on, and when questioned were in custody on charges for which they had lawyers. The majority offers no reason why their status as former fugitives should have impaired their right to counsel. Indeed, the *Bing* court rejected the argument that "a defendant who absconds and never contacts his lawyer . . . has terminated the attorney-client relationship" (76 NY2d at 346).

The facts of *Bing* are relevant to our case in another way: In *Bing*, as here, the only existing attorney-client relationship was in a case from another state. It does not make sense to suppress a confession in a New York case solely because of a relationship that is governed by the laws of Ohio or Pennsylvania; those states can decide for themselves how the relationship can best be protected. It was this that persuaded then-Judge Kaye, who was opposed to overruling *Bartolomeo*, to concur in the result in *Bing*. She acknowledged "the absurdity of extending *Bartolomeo* to [the *Bing*] facts" (76 NY2d at 356 [concurring in *Bing* and dissenting in *Cawley*]).

*Bing* was identical to this case in all material respects: a defendant in custody on an out-of-state charge, interrogated by New York officers about an unrelated New York crime. Though the *Bing* court was divided 4-3 on the question of overruling *Bartolomeo*, all seven Judges agreed that Bing's right to counsel had not been violated. Since the majority here accepts *Bing* as good law, it is hard to understand how it reaches the opposite conclusion.

I conclude that the effort to find consistency in our cases in this area is a fruitless one. I therefore return to a more basic point: In common sense, Detective Mattei did nothing wrong and this defendant's right to a lawyer was not interfered with in any way. He did not have a lawyer in the case Detective Mattei was talking to him about, and he validly waived his right to counsel in that case. The fact that he had a lawyer in an unrelated Pennsylvania case should be of no significance.

We said in *People v Steward*: "*Bing* unequivocally eliminates any right to counsel derived solely from a defendant's representation in a prior unrelated proceeding" (88 NY2d at 500). Today's majority echoes this comment—"the derivative right no longer exists" (majority op at 384). *Steward* said, and today's majority repeats, that the right recognized in *Rogers* is not

"derivative," but I do not see how this can be so if the word derivative has any intelligible meaning (*see West*, 81 NY2d at 378 ["(l)ike *Rogers*, (the *Bartolomeo*) right was derivative"]). If this defendant's right in this New York case did not derive from his Pennsylvania representation, where did it come from?

For these reasons, I think we should accept, at long last, the logical implication of *Bing*: The rule of *Rogers*, as well as that of *Bartolomeo*, is unjustifiable. We should return to the *Taylor* rule. I would therefore hold that the courts below committed no error in admitting defendant's statements to Detective Mattei into evidence. I would not reach the question of harmless error.

Chief Judge LIPPMAN and Judges CIPARICK and JONES concur with Judge GRAFFEO; Judge SMITH concurs in result in a separate opinion in which Judges READ and PIGOTT concur.

Order affirmed.