[931 NYS2d 349]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAZOLTUV BORUKHOVA, Appellant.

Second Department, October 25, 2011

## APPEARANCES OF COUNSEL

*Dershowitz, Eiger & Adelson, P.C.*, New York City (*Nathan Z. Dershowitz, Amy Adelson, Victoria B. Eiger, Daniela Klare Elliot* and *Alan M. Dershowitz*, of the Massachusetts bar, admitted pro hac vice, of counsel), for appellant.

*Richard A. Brown, District Attorney*, Kew Gardens (*Gary Fidel* and *Donna Aldea* of counsel), for respondent.

## OPINION OF THE COURT

ENG, J.

On the morning of October 28, 2007, Daniel Malakov, a 34-year-old dentist, left his busy office to take his young daughter Michelle to a nearby park where he had agreed to bring the child for a visit with her mother, the defendant Mazoltuv Borukhova. As Malakov was waiting for the defendant to arrive, he was shot to death in front of four-year-old Michelle by a man wielding a gun equipped with a makeshift silencer fashioned out of a bleach bottle and duct tape. The codefendant Mikhail Mallayev's fingerprints were found on the silencer, and an eyewitness identified Mallayev as the shooter. At the time of the shooting, Malakov and the defendant were in the midst of a bitter divorce action, and Malakov was murdered just three weeks after the justice presiding over that action issued an order unexpectedly taking temporary custody of Michelle away from the defendant and awarding temporary custody to Malakov. Following an investigation, the defendant was arrested and charged, inter alia, with murder in the first degree, on the theory that she had hired Mallayev to kill her husband.

At the conclusion of a lengthy jury trial held in the winter of 2009, the defendant was convicted of murder in the first degree and conspiracy in the second degree. She now appeals, raising numerous challenges to her conviction, including a claim that statements she made to the police in the hours after her husband's death should have been suppressed because she was not given *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]), and that some of the statements were obtained in violation of her right to counsel. The defendant also assigns error to a number of the trial court's evidentiary rulings, which, among other things, allowed the prosecution to introduce testimony that one of her sisters made a threat against Malakov's life three days before his death. We conclude that while certain statements made by the defendant should have been suppressed by the hearing court, and the testimony regarding the threat made by the defendant's sister should not have been admitted into evidence at trial, these errors were harmless beyond a reasonable doubt, and the defendant was not deprived of her right to a fair trial.

The defendant Mazoltuv Borukhova and the victim, her estranged husband Daniel Malakov, were both born in Uzbekistan and emigrated to the United States as young adults. In the United States, Malakov attended dental school at New York University, and an orthodontic program at Columbia University. After completing his education, he opened a dental practice specializing in orthodontics in Forest Hills, Queens. The defendant received a degree in general medicine and surgery from a medical school in the former Soviet Union, thereafter successfully passed her medical boards in the United States, and completed a residency at the Brooklyn Hospital Center. The couple met in the fall of 2001, and married after only a brief courtship. Their daughter Michelle was born in February 2003. The defendant and Malakov first separated in November 2003, but reconciled about a year later. The reconciliation was short-lived, however, and the couple separated again in April 2005. Following the 2005 separation, Malakov commenced an action for a divorce against the defendant, which proved so acrimonious that his father was later to describe it as "a completely unfriendly and uncivilized divorce."

In or about June 2005, a lawyer was assigned to represent Michelle in the divorce action as the attorney for the child. Over the next two years, Malakov and the defendant were engaged in extensive litigation over custody and visitation issues. At an

early stage in the divorce action, Malakov, the defendant, and the attorney for the child stipulated that the defendant would have temporary custody of Michelle, and Malakov would have supervised visitation. After monitoring the progress of Malakov's visits with Michelle through reports made by the supervising agency, and meeting with both parents and the child in his own office, in April 2007 the attorney for the child recommended to Supreme Court Justice Sidney Strauss that Malakov have unsupervised visitation with Michelle. The defendant contested the recommendation, and Malakov's visitation continued to be supervised throughout the spring and summer of 2007.

However, when the parties appeared in the Supreme Court on October 2, 2007, Justice Strauss sua sponte issued an order taking temporary custody of Michelle away from the defendant and awarding temporary custody to Malakov. In an oral decision placed on the record in the presence of both parents, the Supreme Court described the defendant as overbearing and smothering, and was highly critical of what it perceived to be her efforts to prevent Michelle from developing a bond with her father. Among other things, Justice Strauss relied upon reports from the supervising agency to conclude that the defendant was sabotaging Malakov's efforts to engage Michelle by carrying the child into the visitation room, insisting upon being present during the visits, and "shutting the father out" by playing with Michelle and feeding her snacks. In accordance with the Supreme Court's order, temporary physical custody of Michelle was transferred to Malakov on Monday, October 22, 2007. The transfer of custody was filmed by a freelance television cameraman hired by the defendant to document the event. As shown in the videotape, the transfer of custody was upsetting for Michelle, as well as for her parents and the members of the Malakov and Borukhova families who witnessed it. The defendant carried Michelle the two blocks between her apartment and the home of Malakov's father, where the transfer took place, and the defendant continued to hold onto Michelle as Malakov attempted to take the crying child into his arms.

On Thursday, October 25, 2007, three days after the transfer of custody, both the defendant and her sister Sofya Borukhova (hereinafter Sofya) allegedly made threats against Malakov's life to members of his family. The first incident occurred in the morning, when Malakov's uncle Ezra Malakov (hereinafter Ezra), who lived near the defendant in Forest Hills, saw the defendant standing on the street talking on her phone. Noticing

that the defendant seemed worried and anxious, Ezra asked her what was wrong, and she replied that Malakov had taken away her child. When Ezra attempted to reassure her by promising to help her get Michelle back, the defendant replied, "I don't need any help. His days are numbered. Everything is decided about them." The second incident occurred that night, when Malakov's father Khaika Malakov (hereinafter Khaika) ran into Sofya on the street in the Forest Hills neighborhood where they both lived. According to Khaika, Sofya confronted him about the change in custody, and threatened that if his family did not refuse custody of Michelle and give her back, "[y]ou're going to lose your son on . . . Sunday."

Sunday, October 28, 2007, proved to be the last day of Daniel Malakov's life. That morning, he stopped by his father's house with Michelle on his way to his dental office, which was located about two blocks away. When Khaika asked his son what he was planning to do with Michelle during his office hours, Malakov said that he was "going to give the child to the mother today." Khaika then questioned his son about where the defendant was going to pick up the child, and he replied that the defendant had asked him to bring Michelle to the park near his office.

The waiting room of Malakov's dental office was filled with patients when he arrived that day with Michelle at about 10:30 A.M. Among those present was Marisol Ortiz, who had brought her daughter to have her braces adjusted. Less then five minutes after his arrival, Malakov called in Ortiz's daughter, and quickly performed the adjustment. Ortiz then left the office, accompanied by both her daughter and her young nephew, and headed with the children toward her car, which was parked near the corner of 64th Road and Yellowstone Boulevard in Forest Hills. As she walked toward her car, Ortiz noticed that Malakov and the little girl who had arrived at his office with him were walking a few feet in front of her, heading toward a nearby park.

When Ortiz reached the park, she noticed a woman, dressed in dark clothing, walking toward her on 64th Road. Malakov and the little girl stopped by the gate in front of the park, while Ortiz continued on to her car with her daughter and nephew. One or two minutes later, when Ortiz was seated inside her car with the children, she heard what "[s]ounded like a muffled shot." From a distance of about one or two car lengths away, she saw a man standing a few feet away from Malakov and pointing his right arm at him. According to Ortiz, the man was

wearing a dark jacket and was about 5 feet 9 inches or 5 feet 10 inches tall, with a stocky build. Two more shots rang out, and Ortiz saw Malakov fall to the ground. Ortiz noticed that the little girl who had been with Malakov was now with a woman, who may have been the same woman she had seen walking toward her earlier. After the shooting, the woman cradled the little girl, and calmly walked her into the park, while the shooter jogged away from the park, stopping once to pick up something off the ground. Ortiz ran back to Malakov's office, where she screamed that Malakov had been shot, and then ran back to the scene of the shooting with other people from the office.

Just prior to the shooting, a second eyewitness, Natalie Tabois, was walking her dog along 64th Road across the street from the park when she noticed a man, about six feet tall, who appeared to be "just standing around" waiting. According to Tabois, the man was approximately four to six feet away from a little girl, who was playing with fallen leaves at the base of a tree near the park entrance. Tabois also noticed a woman with reddish curly hair, whom she later identified as the defendant's sister, Sofya, standing close to the child. About two minutes later, as Tabois was bending down to clean up after her dog, she heard a gunshot. After a slight pause, she heard two more gunshots, and saw the man grab his chest. A second, shorter man with a stocky build was standing with his back to her. Tabois saw the shorter man, who was dressed in dark clothing, motion as if he were putting something in his coat, and then turn and walk away. The taller man, still grabbing his chest and now bleeding, fell to the ground. Tabois ran back to her nearby apartment to retrieve her cell phone, and then called 911 as she ran to the victim, reaching him within three or four minutes of the shooting. As she was returning to the victim, Tabois saw a woman with straight black hair, whom she later identified as the defendant, walking toward the park on 64th Road and then breaking into a run once she appeared to notice the victim lying on the ground. By this point, the police had just arrived. As soon as the defendant reached the victim's side, she began trying to resuscitate him.

Meanwhile, Cheryl Springsteen and her boyfriend were also out walking a dog along 64th Road when they passed by a woman and a little girl in front of the park. The little girl began swatting the dog's tail, and Springsteen made eye contact with the woman to see if she was apprehensive about the child touching a strange dog. The woman, later identified by Springsteen

as Sofya, had curly auburn hair, and was wearing a dark coat. Springsteen and her boyfriend continued down 64th Road as the woman and the little girl walked to the entrance of the park, where the woman gave the child some candy. When she was about 30 feet away from the park entrance, Springsteen heard what she thought was a firecracker and turned around toward the park. She then saw a stocky man, about five feet nine inches tall and wearing a dark jacket, standing in front of the entrance to the park "with his right arm extended with a gun in his hands" pointed towards something or someone she could not see. However, she was able to see the man's entire right profile, and to identify him as the codefendant Mallayev.

Springsteen watched as Mallayev fired two more shots and then placed the gun in either his waistband or jacket before walking briskly but calmly up 64th Road toward 102nd Street. According to Springsteen, as Mallayev walked away, the shooting victim took a step from the park onto the sidewalk and fell backwards to the ground. While the shooting was taking place, Springsteen also saw Sofya hastily scoop up the little girl and then walk further into the park.

After the victim fell to the ground, Springsteen told her boyfriend to call 911, and he did so as they walked back toward the corner of 64th Road and Yellowstone Boulevard. When they reached the corner, no one was rendering aid to the victim. However, about 2½ to 3 minutes after the shooting, as Springsteen and her boyfriend stood on the corner, and after a police vehicle had arrived at the scene, a woman, whom Springsteen identified as the defendant, approached the scene from the opposite corner of 64th Road and Yellowstone Boulevard, ran toward the victim, and calmly began administering CPR.

Thomas Danielle was one of the first police officers to respond to the scene of the shooting. Officer Danielle was driving a patrol car about two blocks away, with his windows closed and radio on, when he heard two loud noises he believed to be gunshots. Moments later, Officer Danielle proceeded to the park in response to a radio call of "shots fired." On 64th Road, just past its intersection with Yellowstone Boulevard, Officer Danielle found the victim lying face up on the sidewalk with his feet facing the street and his head facing the adjacent park. Although five to six people were gathered around the victim, no one was providing him with any aid when Officer Danielle first arrived. Officer Danielle radioed for medical assistance and spoke to the people gathered around the victim, who directed

his attention to Ortiz. Officer Danielle walked over to Ortiz, who was seated in a vehicle parked on 64th Road, and spoke to her for 30 to 45 seconds. When he returned to the victim, he found the defendant, who identified herself as a doctor, standing over the victim. At the defendant's request, Officer Danielle helped her administer CPR for approximately two minutes. They both stopped performing CPR when another police officer at the scene indicated that an ambulance was around the corner, although, according to Officer Danielle, it is standard protocol for a first responder to continue resuscitation efforts until relieved by other trained personnel, unless the patient is pronounced dead.

Once the ambulance arrived at the scene at 10:57 A.M., emergency medical technicians began administering CPR to the victim, and transported him to North Shore Hospital in Forest Hills, about five or six blocks from the park. A separate ambulance also transported the defendant to North Shore Hospital for evaluation. The defendant was accompanied to the hospital by Police Officer Jennifer Irving, who had been instructed by a sergeant to stay with the defendant "to make sure she was okay." At the hospital, the defendant was taken first to the emergency room, and then to a private room where medical staff measured her vital signs and performed an electrocardiogram (hereinafter EKG).

Meanwhile, at about 11:40 A.M., Detective Ismet Hoxha arrived at North Shore Hospital to interview the defendant as a witness who might have information about the shooter. In the emergency room, Detective Hoxha explained to the defendant, who appeared calm and was not handcuffed, that he was investigating the shooting. He then questioned her about why she was in the park, the status of her relationship with Malakov, and what she had seen and heard during the shooting. In response to the detective's questions, the defendant explained that she and Malakov were separated, and claimed that she had full custody of their daughter Michelle. She further stated that she had left work to meet with Malakov in order to pick up Michelle. In her account to Detective Hoxha, the defendant said that she was kneeling down and hugging Michelle, 10 to 15 feet away from Malakov, when she noticed that he was on the ground bleeding from the chest. However, she maintained that she had neither seen nor heard her husband being shot, and had not seen anyone walking or running away from the scene of the shooting. The interview ended after 15 or 20 minutes, when the

defendant told Detective Hoxha that "[s]he wanted to think about the events and she will talk to the police at a later time when she feels a little bit better."

After the defendant was medically cleared, Officer Irving asked her whether she would be willing to go to the 112th Precinct to talk to the police, and the defendant replied that "she would like to go." A police car then transported Officer Irving and the defendant to the precinct, where they arrived at about 1:30 P.M.

Shortly before the defendant's arrival at the precinct, her sister Ludmilla Borukhova contacted attorney Matthew Brissenden, and told him that the defendant was being questioned by the police in connection with the shooting death of her husband which had occurred earlier that morning. Brissenden agreed to represent the defendant and, at 1:17 P.M., he called the 112th Precinct and told the person who answered the phone that he was the defendant's counsel, that he wanted to speak to her, and that he did not want her to be questioned until he had an opportunity to speak to her. Before the defendant was questioned by detectives, Sergeant Claudia Bartolomei was given a written message with Brissenden's name and telephone numbers on it, and was instructed to ask the defendant whether she had retained him or knew him. Sergeant Bartolomei proceeded to the precinct lunchroom where the defendant was sitting alone, and asked her whether she had an attorney. When the defendant answered "no," Sergeant Bartolomei told her that an attorney had called saying that he represented her, and showed her the written message. The defendant responded that she had not called an attorney, and didn't know the attorney who had called.

Between 1:45 P.M. and 4:40 P.M., detectives at the 112th Precinct conducted three separate interviews of the defendant. The defendant was never handcuffed at the precinct, the door to the interview room was left open, and she was left by herself between interviews. During the course of the interviews, the defendant told the detectives that she and her husband were separated, and that Malakov had custody of Michelle, but that she had visitation rights. She also stated that she had exchanged several phone calls with Malakov that morning, arranging to meet him on 64th Road, close to his dental office, so that she could pick up Michelle. The defendant further stated that she was walking on 64th Road toward Yellowstone Boulevard when she saw Malakov and Michelle walking towards her. The de-

fendant told the interviewers that she knelt down to give Michelle a hug, and then stood up and began swinging the little girl by her arms. At this point, the defendant then saw Malakov on the ground bleeding from the chest.

Although the defendant indicated to police detectives that she was standing 10 to 15 feet away from Malakov, she continued to claim that she had not heard any gunshots, had not seen anyone shoot Malakov, and had not seen anyone walking or running away from the scene. When one of the detectives questioned the defendant about how it could have been possible for her not to hear the "three loud gunshots which were heard throughout the neighborhood," and attempted to impress upon her the importance of getting the information needed to find her husband's killer, the defendant responded that "she needed time to think about it, and she wanted to get back to [the police] with the story." The defendant also adamantly maintained that Malakov was not the type of person who would stop her from seeing her daughter, and emphasized several times that she had administered CPR to her husband.

The final interview ended at 4:40 P.M., when Detective Hoxha was informed that a lawyer for the defendant was at the precinct, and then spoke to Brissenden, who requested that the defendant not be questioned. By the time that Brissenden was permitted to see the defendant, he had been at the precinct for more than an hour.

In the days following the shooting, the police began to uncover evidence linking the defendant and codefendant Mikhail Mallayev to the crime. Key evidence of Mallayev's identity as the shooter came from the discovery of a makeshift silencer at the crime scene. The silencer was fashioned from a plastic bleach bottle and duct tape, and residue on the bottle was consistent with the discharge of a firearm into it. Two days after the shooting, a police detective matched two of the latent fingerprints on the silencer to Mallayev, who was married to the defendant's cousin and lived in the State of Georgia.

The investigation also uncovered a large increase in the number of telephone calls exchanged between the defendant's cell phone and Mallayev's cell phone, starting shortly after the attorney for the child recommended unsupervised visitation between Michelle and her father in the spring of 2007, gaining in intensity after the issuance of the October 2, 2007 order directing the transfer of custody, and peaking after the physical transfer of custody on October 22, 2007. More specifically,

telephone company records indicated that, during the four-month period between January 1, 2007, and May 1, 2007, only four calls were exchanged between the defendant's cell phone and Mallayev's cell phone. However, from May 1, 2007, to October 1, 2007, approximately 44 calls were exchanged between the two cell phones. Approximately 91 calls were exchanged from October 2, 2007, when the order changing custody was issued, through October 26, 2007, with approximately 61 of those calls made after the transfer of custody of Michelle to Malakov was effected on October 22, 2007. The telephone records additionally indicated that Mallayev was in Queens between October 25, 2007, and October 28, 2007, because various calls on his cell phone were received and transmitted via a cell phone tower near the crime scene. After the shooting, the volume of calls between the defendant's cell phone and Mallayev's cell phone decreased precipitously, with only three brief calls exchanged on October 30, 2007, November 7, 2007, and November 16, 2007. Investigation further revealed that although Mallayev and his wife were deeply in debt, on May 14, 2007, a $9,900 cash deposit was made at a Bank of America branch in Forest Hills into an account jointly held by Mallayev and his children, and on that same date a second $9,900 cash deposit was made at a Washington Mutual Bank branch in Forest Hills into an account held by Mallayev. Airline records revealed that Mallayev flew into New York from Atlanta on the afternoon that these cash deposits were made, and took a return flight back to Atlanta at about 7:00 P.M. that evening. On November 8, 2007, less than two weeks after the murder, Mallayev made an additional cash deposit totaling $19,800 at a Bank of America branch in Brooklyn, placing the money into multiple accounts in which he had an ownership interest.

On November 17, 2007, almost three weeks after the shooting, three New York City detectives traveled to Georgia to speak to Mallayev. According to New York City Police Detective Edward Wilkowski, after Mallayev had been advised of his *Miranda* rights and agreed to waive them, Detective Wilkowski asked him when he had last been in New York, and Mallayev replied that his last visit had been in October, but that he had left on October 23, 2007, five days before the shooting. Detective Wilkowski then questioned Mallayev about what he had been doing from October 26 to October 29, 2007, and Mallayev stated that he had been at his home in Chamblee, Georgia, with his wife and sons. Detective Wilkowski twice asked Mallayev if

he was sure that he was in Georgia rather than New York on those dates, and Mallayev continued to maintain that he was sure. Detective Wilkowski then confronted Mallayev with the fact that his cell phone records indicated that he had been in Forest Hills, Queens, from October 26 to October 28, 2007. After looking at a calendar, Mallayev told Detective Wilkowski that he now recalled having visited a friend in New York from October 25 through October 28, 2007. Mallayev initially maintained that he had left New York around 7:00 A.M. on October 28, 2007, several hours before the shooting, but when told that his cell phone records showed that he was in Brooklyn at 12:07 P.M. on that day, he immediately recalled that he had stopped by his daughter's house in Brooklyn and gone shopping before heading home.

During the course of the interview, Detective Wilkowski also showed Mallayev the defendant's cell phone number, and asked him whether he recognized it. According to Detective Wilkowski, Mallayev replied that he did recognize the number, explaining that the defendant was his wife's relative as well as his family doctor, and that she had administered an EKG to him, and given his wife prescriptions for her high blood pressure. When asked why approximately 65 calls had been exchanged between his cell phone and the defendant's cell phone in the days before the murder, Mallayev retorted, "is there any amount of calls too many when it comes to your health?"

At about midnight on November 18, 2007, Mallayev was placed under arrest for Malakov's murder. He was subsequently extradited to New York, and placed in a lineup from which Cheryl Springsteen identified him as the shooter. Both the defendant and Mallayev were thereafter charged, by indictment voted on February 7, 2008, with crimes including murder in the first degree and conspiracy in the second degree. The first degree murder count was predicated on the theory that the defendant had hired Mallayev to kill her husband.

Prior to trial, the defendant moved, inter alia, to suppress the statements she had made to the police at the hospital and at the 112th Precinct after the shooting. At the conclusion of a *Huntley* hearing (*see People v Huntley*, 15 NY2d 72 [1965]), defense counsel argued that all of the defendant's statements to the police should be suppressed because they were the product of custodial interrogation conducted without the administration of *Miranda* warnings. Defense counsel further contended that the defendant's statements at the precinct had been obtained in

violation of her right to counsel, which attached when Brissenden first called at 1:17 P.M. on October 28, 2007, stating that he represented her, and asking that she not be questioned. The Supreme Court denied the branch of the defendant's omnibus motion which was to suppress her statements to the police, concluding that she was not in custody when interviewed by the police because a reasonable person, innocent of any crime, would have believed that she was being interviewed as a witness to the shooting. The Supreme Court further concluded that the defendant's right to counsel did not attach when Brissenden called the precinct because the defendant unequivocally stated that she did not know who he was, and that he was not her lawyer.

The defendant and Mallayev were jointly tried before a jury at a trial which began on January 26, 2009, and ended about six weeks later on March 10, 2009. At trial, the People presented the testimony of the three eyewitnesses to the shooting—Marisol Ortiz, Natalie Tabois, and Cheryl Springsteen. The People also introduced evidence of the various statements that the defendant made to the police at the hospital and at the precinct on the day of the shooting. The People's direct case additionally included testimony regarding the threats that the defendant and her sister Sofya allegedly made against Malakov, and of the custody and visitation battle between the defendant and Malakov which culminated in the order transferring temporary custody of Michelle to her father. The People offered proof of the large volume of calls exchanged between the defendant's cell phone and Mallayev's cell phone in the days leading up to the shooting, and the cash deposits into Mallayev's bank accounts. In addition, there was evidence that two of the latent fingerprints found on the makeshift silencer matched Mallayev's fingerprints. The People's case further included a tape-recorded conversation between the defendant and Mallayev in the Bukhori language which took place on May 14, 2007, and was translated for the jury by an FBI language specialist. However, the content of the recording was not directly inculpatory.

The defendant took the stand on her own behalf, and gave an account of the shooting that was generally consistent with her earlier statements to the police. The defendant testified that on Friday, October 26, 2007, she arranged with her husband to see Michelle that coming Sunday, planning to call him Sunday morning to decide on a specific meeting time. After checking on some patients at North Shore Hospital on the morning of October 28, she spoke to her husband on the phone at about

10:45 A.M., and began walking on 64th Road to meet him and Michelle at his dental office. Before she reached the office, she saw her husband and Michelle crossing Yellowstone Boulevard and walking towards her. As they approached, the defendant knelt down and opened her arms, and Michelle ran to her. The defendant picked Michelle up and swung her around a few times. Malakov then joined in the swinging, holding Michelle's lower body as the defendant continued to hold her upper body. As the defendant explained it, she suddenly felt as if she could not hold Michelle anymore, and realized that Malakov had let go of the child. He ran into the middle of the road grabbing his chest, and the defendant noticed blood on his hands. The defendant did not hear a gunshot or see anything suspicious, such as someone shooting a gun or running away. In shock, the defendant grabbed Michelle and ran into the park, crying out for help before sitting down with her daughter on a swing.

Continuing her account, the defendant testified that she took out her phone and dialed 911 at 10:48 A.M., but was too upset to get any words out. After hearing someone saying, "the dentist is shot . . . He's on the ground. He's bleeding," the defendant left Michelle with a woman she recognized from prior visits to the park, and ran over to administer CPR to her husband. After Emergency Medical Service personnel arrived and placed her husband on a stretcher to transport him to the hospital, the defendant started to feel very bad chest pain, and thought she was having a heart attack. An ambulance was called to assist her, and she was also taken to the hospital.

To account for the large volume of calls exchanged between her cell phone and Mallayev's cell phone, the defendant further testified that she provided medical treatment to both Mallayev and his wife Mazoltuv, who is her cousin. The defendant claimed that she first treated the Mallayevs, and administered EKG tests to them, on May 15, 2007. On that date, she diagnosed Mazoltuv with uncontrolled high blood pressure. Concerned that Mazoltuv was at high risk for a heart attack, the defendant instructed her to check her blood pressure every day, and call daily with the results. The defendant further testified that Mazoltuv visited her office on both October 16 and October 17, 2007, complaining of symptoms including chest pain, and that she provided Mazoltuv with contact information for a cardiologist. The defendant further testified that, a few days later, on October 22, 2007, the date physical custody was transferred, Mazoltuv, who was again in New York, called the defendant

throughout the day complaining of chest pain and shortness of breath. The defendant instructed Mazoltuv to go to a hospital emergency room, but she refused to do so.

During the course of her testimony, the defendant also stated that she had tape recorded her May 14, 2007 conversation with Mallayev to "document" her signature on a contract with his construction company to build a house in Georgia. She further revealed that on the afternoon of Saturday, October 27, 2007, she called the Spy Shop store in Manhattan, and that at 7:00 P.M. that evening she went to the Spy Shop and purchased a small "button camera" for about $750 in cash. According to the defendant, the purpose of purchasing the button camera, which Michelle would not be able to see operating, was to record the defendant's scheduled meeting with Malakov to pick up Michelle for visitation, as the child's therapist had recommended she do. While the defendant acknowledged that her religious beliefs prohibited her from using the telephone on the Jewish Sabbath, she characterized her call to the Spy Shop as an emergency which justified the call. However, the defendant was unable to set up the camera, and did not have it with her at the time of the shooting.

The jury began deliberations on the afternoon of March 9, 2009, and on the next afternoon, March 10, 2009, they returned a verdict finding both the defendant and Mallayev guilty of murder in the first degree, and conspiracy in the second degree. Mallayev was additionally convicted of one count of criminal possession of a weapon in the second degree. The defendant was sentenced, inter alia, to life imprisonment without parole on her conviction of murder in the first degree.

We turn first to the defendant's challenge to the Supreme Court's suppression ruling. On appeal, the defendant continues to maintain that all of her statements should have been suppressed because she was in custody when the police questioned her without administering *Miranda* warnings. She additionally argues that the statements made at the precinct should have been suppressed because they were obtained in violation of her right to counsel, which attached when Brissenden made his first phone call to the 112th Precinct at 1:17 P.M. on October 28, 2007. The *Miranda* warnings are procedural safeguards intended to secure the Fifth Amendment privilege against self-incrimination by protecting individuals from the informal compulsion exerted by law enforcement officials during custodial questioning (*see Miranda v Arizona*, 384 US 436, 444, 461

[1966]; *People v Paulman*, 5 NY3d 122, 129 [2005]; *People v Berg*, 92 NY2d 701, 704 [1999]). The standard for assessing whether an individual is in custody for purposes of applying the *Miranda* rule is whether a reasonable person innocent of any wrongdoing would have believed that he or she was free to leave the presence of the police (*see People v Paulman*, 5 NY3d at 129; *People v Yukl*, 25 NY2d 585, 589 [1969], *cert denied* 400 US 851 [1970]).

■ Applying this standard here, we conclude that the evidence presented at the *Huntley* hearing supports the Supreme Court's determination that the defendant was not in custody when she spoke to the police at the hospital and at the 112th Precinct on the day of Malakov's murder, and thus the duty to administer *Miranda* warnings was not triggered. Although Officer Irving accompanied the defendant to the hospital and remained with the defendant while she was treated, Officer Irving had been instructed to do so to ensure that the defendant, who had apparently undergone the trauma of seeing her husband being shot, was okay. While at the hospital, Officer Irving did not question the defendant about the shooting, or restrict the defendant's freedom of movement in any manner.

The only interview of the defendant which took place at the hospital was conducted by Detective Hoxha. Detective Hoxha spoke to the defendant for only 15 to 20 minutes, and his questions were investigative rather than accusatory in nature, focusing on the defendant's relationship to the victim and her role as a witness. The hearing record further establishes that after the defendant was medically cleared to leave the hospital, she voluntarily agreed to accompany the police to the local precinct. While the defendant was questioned more extensively at the precinct over a period of approximately three hours, the questioning was not continuous. Further, the questioning remained investigatory in nature, and the detectives emphasized to the defendant the importance of providing accurate information so that they could find her husband's killer. The defendant was left alone and unsupervised in between the interviews conducted by the detectives, she was not handcuffed or restrained, and she was never accused of any complicity in the crime. Taking these circumstances into consideration, the Supreme Court properly concluded that a reasonable person innocent of any crime would not have believed that he or she was in custody, either at the hospital or at the precinct (*see People v Floyd*, 85 AD3d 1052 [2011], *lv denied* 17 NY3d 816 [2011];

*People v Martin*, 68 AD3d 1015, 1016 [2009]; *People v Sampson*, 67 AD3d 1031 [2009]; *People v Ingram*, 19 AD3d 101, 102 [2005]; *People v Gren*, 285 AD2d 612, 613 [2001]).

██ However, there is merit to the defendant's contention that the statements she made at the precinct should have been suppressed because they were obtained in violation of her right to counsel. "New York has long viewed the right to counsel as a cherished and valuable protection that must be guarded with the utmost vigilance" (*People v Lopez*, 16 NY3d 375, 380 [2011]; *see People v West*, 81 NY2d 370, 373 [1993]; *People v Harris*, 77 NY2d 434, 439 [1991]). The right to counsel, grounded on this State's constitutional guarantee of due process, the entitlement to effective assistance of counsel, and the privilege against self-incrimination, "extends well beyond the right to counsel afforded by the Sixth Amendment of the United States Constitution and other State Constitutions" (*People v Davis*, 75 NY2d 517, 521 [1990]; *see People v Lopez*, 16 NY3d at 380; *People v Grice*, 100 NY2d 318, 320 [2003]). In New York, the right to counsel is considered "indelible" because, once it attaches, the police may not question an individual unless he or she affirmatively waives the right in the presence of counsel (*see People v Lopez*, 16 NY3d at 380; *People v Grice*, 100 NY2d at 320-321; *People v Arthur*, 22 NY2d 325, 329 [1968]).

The right to counsel attaches in several different ways (*see People v Grice*, 100 NY2d at 321). Attachment occurs whenever a criminal proceeding is commenced against the defendant by the filing of an accusatory instrument, regardless of whether the defendant has actually retained or requested a lawyer (*see People v Lopez*, 16 NY3d at 380; *People v West*, 81 NY2d at 373). The right to counsel can also attach prior to the commencement of formal proceedings when a person in custody asks to speak to an attorney, or when an attorney enters the case to represent an uncharged individual (*see People v Lopez*, 16 NY3d at 380; *People v Grice*, 100 NY2d at 321). "When an attorney enters a case to represent the accused, the police may not question the accused about that matter regardless of whether the person is in police custody" (*People v Lopez*, 16 NY3d at 380; *see People v West*, 81 NY2d at 375). An attorney "enters" a case by actually appearing or directly communicating with the police by telephone (*see People v Grice*, 100 NY2d at 322).

Court of Appeals jurisprudence establishes that the issue of whether an attorney has entered a case is not dependent upon whether that attorney has been personally retained by the de-

fendant, or has instead been retained by a member of the defendant's family (see *People v Garofolo*, 46 NY2d 592 [1979]; *People v Pinzon*, 44 NY2d 458 [1978]; *People v Donovan*, 13 NY2d 148 [1963]). For example, in *People v Pinzon,* the defendant was brought to the Third Precinct in Suffolk County on the morning of July 18, 1973, for questioning about how his two-year-old stepson had sustained serious injuries which ultimately resulted in the child's death. Shortly before 1:00 P.M. that afternoon, an attorney retained by the defendant's family made three telephone calls to Suffolk County Police Headquarters. During these calls, he identified himself as the defendant's attorney, asked to speak with him, and requested that the defendant not be questioned until he arrived. The calls, which were received by civilian switchboard operators, were not transferred or forwarded to the defendant, the interrogating officers, or their supervisors. Instead, the attorney was erroneously informed that the police did not "have" the defendant. After the attorney's third unsuccessful attempt to speak to the defendant, the defendant orally confessed that he had struck his stepson several times with his fists on the evening of July 17, 1973. The defendant subsequently moved to suppress the statements he made to the police, but the hearing court denied his motion, concluding that his right to counsel did not attach because the attorney spoke only to the civilian operators at the police department's central switchboard. The defendant was thereafter convicted of criminally negligent homicide.

A divided panel of this Court reversed the conviction, concluding that the defendant's statements to the police should have been suppressed because they were obtained in violation of his right to counsel. The Court of Appeals agreed that the statements had been improperly obtained, concluding that when the defendant's attorney called the general information number at police department headquarters, identified himself and asked to speak with the defendant, and further requested that there be no questioning, "the police should have been on notice that an attorney had appeared on behalf of the defendant then in custody" (*People v Pinzon*, 44 NY2d at 464). The Court of Appeals further observed that

> "the right to counsel is of little value if the attorney cannot communicate with the defendant or with the officials holding him in custody or can only reach them after extended delay when the investigation is, in effect, completed. The police, of course, must

recognize this and must also realize that even though the defendant may not have retained counsel prior to being taken into custody, an attorney, later retained by friends or family or otherwise representing him, may wish to consult with him while he is being questioned by the police" (*id.* [citation omitted]).

Guided by these principles, we conclude that the defendant's right to counsel in this case attached at 1:17 P.M. on the day of the murder, when the attorney retained by her sister Ludmilla, Matthew Brissenden, called the 112th Precinct, identified himself as the defendant's attorney, asked to speak to her, and requested that she not be questioned until he had an opportunity to speak to her. Under these circumstances, the defendant could not effectively waive her right to counsel outside of the presence of the attorney her sister had arranged to represent her, and, accordingly, all of her statements made at the precinct in the course of the three interviews, which began at 1:45 P.M., should have been suppressed.

The People nevertheless argue, relying upon our decision in *People v Lennon* (243 AD2d 495 [1997]), that the defendant's right to counsel did not indelibly attach because she repudiated Brissenden's representation. In *Lennon*, the defendant, who was a suspect in her husband's murder, agreed to accompany the police to the police station. The defendant's father contacted an attorney who had represented her in prior matters, and the attorney then telephoned the station, stating that he was on his way. When the detective interviewing the defendant told her that this attorney was on his way and asked her whether she wanted him to represent her, she "spoke disparagingly of him, and stated in no uncertain terms that if she needed a lawyer to represent her in this case, it would not be him" (*id.* at 496). Stressing that the defendant "made it quite clear that she did not wish to extend her relationship with the attorney to include the matter in question, despite being given the opportunity to have him represent her," we concluded that "under the circumstances of this case, the attorney's appearance in the matter did not cause the defendant's right to counsel to attach indelibly" (*id.* at 497). In reaching this conclusion, we distinguished the Court of Appeals' decisions in *Garofolo* and *Pinzon* by observing that, in those cases, "it was impliedly assumed that an attorney-client relationship existed with regard to the matter in question, and that the defendant would not have rejected the attorney retained by the family" (*id.*).

In marked contrast to *Lennon*, where the defendant unequivocally rejected representation by an attorney who had represented her in prior matters, here, the defendant merely stated that she had not called an attorney, and did not know Brissenden. As a review of the case law in this area makes readily apparent, the scenario in which a defendant's family retains counsel after he or she is brought in for questioning is quite common. Affording an indelible right to counsel to an individual facing the prospect of police questioning once an attorney has actually entered the case serves the important function of ensuring that any waiver of the right is truly knowing and intelligent (*see People v West*, 81 NY2d at 374). To hold that the defendant, unaware that her sister had arranged for representation, and denied an opportunity to speak to the attorney who had been retained on her behalf, repudiated that attorney by merely stating that she did not call him and did not know who he was, would undermine the safeguards which the right to counsel is intended to provide in such circumstances.

■ However, we are satisfied that the admission into evidence of the statements made by the defendant at the precinct constituted harmless error because the proof of her guilt, without reference to these statements, was overwhelming, and there is no reasonable possibility that the jury would have acquitted her had it not been for this constitutional error (*see People v Gillyard*, 13 NY3d 351, 356 [2009]; *People v Paulman*, 5 NY3d 122, 134 [2005]; *People v Crimmins*, 36 NY2d 230, 237, 241-242 [1975]; *see also People v Payne*, 41 AD3d 512, 514 [2007]; *People v Wood*, 40 AD3d 663 [2007]; *People v Moses*, 35 AD3d 766, 767 [2006]). Significantly, the defendant's statements at the precinct, which included her claim that she had seen and heard nothing, and that she needed more time to think, were largely duplicative of the properly admitted statements she had made to Detective Hoxha earlier in the day at the hospital.

Further, the overwhelming proof of the defendant's guilt included compelling evidence that Mallayev was the shooter, and that he killed the defendant's estranged husband at her behest in exchange for payment. Mallayev's fingerprints were found on the makeshift silencer recovered from the crime scene, he matched the general description of the shooter provided by eyewitnesses Ortiz and Tabois, he was identified as the shooter by eyewitness Springsteen, and cell phone records placed him near the crime scene on the weekend of the murder. While Mallayev, who was married to the defendant's cousin and lived in

Georgia, had no apparent motive for shooting Malakov, the defendant, who was in the midst of an acrimonious divorce action and a bitter custody feud with her husband, had a strong motive for the crime, and indeed told her husband's uncle three days before the shooting that Malakov's "days [were] numbered." Moreover, there was testimony that it was the defendant who arranged for Malakov to meet her at the park where the shooting took place.

Additional evidence of the defendant's guilt included the unusually large volume of calls exchanged between the defendant's cell phone and Mallayev's cell phone from October 2, 2007, when the order changing Michelle's custody was issued, through October 26, 2007, with approximately 61 of those calls made after the actual transfer of custody on October 22, 2007. There was also evidence that a brief call was made on November 7, 2007, while Mallayev's phone was in New York, and that, on the following day, Mallayev deposited the sum of $19,800 in various accounts at a Brooklyn bank before returning to Georgia.

Further, the defendant's account of the shooting was of dubious plausibility. Not only did the defendant claim that she and her estranged husband were playfully swinging their child together just six days after the emotionally wrenching transfer of custody, but that she saw and heard absolutely nothing at the scene of the shooting despite the fact that the eyewitnesses, as well as a police officer on patrol two blocks away, heard the fatal gunshots. While the defendant offered innocent explanations for the circumstantial evidence against her, her testimony tended to ring false in many respects, and the evidence suggested, among other things, that she had falsified records from her medical practice in an effort to lend credence to her claim that the large number of calls exchanged between her cell phone and Mallayev's cell phone were attributable to his wife's high blood pressure. For example, while the defendant testified that she first treated both Mallayev and his wife on May 15, 2007, medical records from her practice indicated that she administered EKG examinations to them months earlier, in August 2006, and the People presented evidence that Mallayev flew from New York to Atlanta on the evening of May 14, 2007, and thus was not in New York when the defendant supposedly treated him on May 15, 2007. Under these circumstances, the erroneous admission of the statements made by the defendant at the precinct was harmless error which does not require reversal.

The defendant further contends that the Supreme Court erred by admitting into evidence a series of "extraordinarily prejudi-

cial" hearsay statements. First, she contends that Khaika Malakov was erroneously permitted to testify that on the Thursday before the murder, Sofya Borukhova confronted him about the change in custody, and threatened if the Malakov family did not refuse custody of Michelle and give her back, "[y]ou're going to lose your son on . . . Sunday." The People maintain that Sofya's threatening statement was nonhearsay with respect to the conspiracy charge against the defendant because it was not offered for its truth, but instead as circumstantial evidence that by the Thursday prior to Malakov's death, there was already a plan in place to murder him. In any event, even if the challenged statement was offered for its truth, the People submit that the statement was admissible under the coconspirator exception to the hearsay rule.

As the Court of Appeals explained in *People v Caban* (5 NY3d 143, 148 [2005]), "the same evidence may be admissible under different theories when offered for different purposes." In *Caban*, a prosecution witness testified that the defendant was a drug dealer who offered to pay $5,000 for the murder of a rival dealer. According to the witness, the defendant's coconspirator Derrick Garcia accepted the offer by stating "I'll do it" (*id.* at 147) and later shot the victim to death. The jury convicted the defendant of conspiracy to commit murder, but acquitted him of the substantive charges of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree. On appeal, the defendant argued, inter alia, that the trial court had erred in permitting the prosecution witness to testify that Garcia accepted the offer to kill the victim by stating "I'll do it." The Court of Appeals concluded that while Garcia's statement would have been hearsay if offered to prove the murder and related charges of which the defendant was acquitted, it was nonhearsay when offered to prove the conspiracy charge. In this regard, the Court reasoned that

> "Garcia's acceptance of defendant's solicitation to murder [the victim] was relevant not for its truth, but rather as evidence of an agreement to commit the underlying crime—itself an essential element of the crime of conspiracy. In other words, whether or not Garcia in fact killed [the victim], his acceptance of defendant's invitation to do so was a verbal act which rendered defendant and his coconspirators culpable for the inchoate crime of conspiracy, even if the planned substantive crime never came to frui-

tion. Indeed, even if Garcia had no genuine intent ever to commit the murder, defendant would be guilty of conspiracy if he believed he had entered into such an agreement" (*id.* at 149).

■ To the extent that Sofya's statement "[y]ou're going to lose your son on . . . Sunday" can be viewed as circumstantial evidence of the existence of a conspiracy between her sister and Mallayev to murder Malakov, it would have been admissible nonhearsay only if offered to prove the conspiracy charge. However, the jury was never instructed to consider Sofya's statement only with respect to the conspiracy charge. In the absence of a proper limiting instruction, we cannot conclude that the statement was properly admitted as a verbal act in proof of the conspiracy charge.

Furthermore, Sofya's statement was not otherwise admissible for all purposes under the coconspirator exception to the hearsay rule. Pursuant to that exception, a declaration made by a coconspirator during the course of and in furtherance of the conspiracy is admissible against other coconspirators on the premise that all participants in a conspiracy are deemed responsible for each of the acts and declarations of the others (*id.* at 148; *see People v Bac Tran*, 80 NY2d 170, 179 [1992]). Although the People theorize that Sofya was an uncharged coconspirator, the only evidence of her possible participation in the murder conspiracy, independent of the threatening statement described above, consisted of testimony identifying her as the woman who was with Michelle immediately prior to the shooting, and indicating that, after the shooting, she walked the child into the park instead of assisting Malakov. This evidence was insufficient to establish, prima facie, that Sofya was an uncharged coconspirator in the murder plan (*see* Penal Law § 105.15).

Since the coconspirator exception to the hearsay rule does not apply, it was error for the trial court to admit evidence of Sofya's threatening statement in the absence of an appropriate instruction cautioning the jury that it could be considered only as proof of the conspiracy charge. Nevertheless, as we have discussed, the evidence of the defendant's guilt was overwhelming. Moreover, there is no significant probability that she would have been acquitted had it not been for the nonconstitutional error in admitting Sofya's statement. Thus, the error was harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d at 237; *People v Cancer*, 16 AD3d 835, 839 [2005]; *People v Sawyer*, 288 AD2d 73 [2001]).

The defendant next contends that it was error to admit Khaika's testimony that his son told him on the morning of his death that he was bringing Michelle to the park for the defendant to pick up because she had asked him to do so. The defendant contends that this testimony was not admissible under the state-of-mind exception to the hearsay rule as a statement of Malakov' s intent to engage in future conduct because it did not relate to his future intent, but instead to the defendant's alleged past desire. However, the state-of-mind exception to the hearsay rule is not so narrow in scope as to permit testimony of Malakov's future intent to bring Michelle to the park, but preclude testimony of his prior arrangement with the defendant to meet at that location. Under the state-of-mind exception to the hearsay rule, a statement of intent to engage in future conduct with a nondeclarant defendant may be admitted where certain foundational safeguards are satisfied (see People v James, 93 NY2d 620, 634 [1999]). The foundational safeguards which serve as a prerequisite for admissibility are that (1) the declarant is unavailable, (2) the statement of the declarant's intent unambiguously contemplates some future action by the declarant, either jointly with the defendant or which requires the defendant's cooperation for its accomplishment, (3) to the extent that the declaration expressly or impliedly refers to a prior understanding or arrangement with the nondeclarant defendant, it must be inferable under the circumstances that the understanding or arrangement occurred in the recent past and that the declarant was a party to it or had competent knowledge of it, and (4) there is independent evidence of reliability, which requires a showing of circumstances that all but rule out a motive to falsify, and evidence that the intended future acts were at least likely to have actually occurred (id. at 634-635).

■ These foundational requirements were satisfied here. The challenged statement was made by an unavailable declarant— the murder victim—and unambiguously contemplated joint future action with the defendant consisting of meeting her at the park to turn over Michelle for visitation. Moreover, the fact that the statement refers to the defendant's "past desire" to meet at the park does not render it inadmissible. It can be readily inferred that the prior arrangement to meet in the park was made in the recent past, since, at the time when the challenged statement was uttered, Malakov had only had sole temporary custody of Michelle for six days. It is also clear that Malakov was a party to the arrangement, since his words to his

father were that the defendant had asked him to bring Michelle to the park. Finally, independent evidence of the reliability of the statement is provided, inter alia, by evidence that, after treating one patient, Malakov left his busy dental office and walked with his daughter to the park, and that he was standing outside the entrance to the park as though he were waiting for someone when Mallayev approached and shot him to death. Accordingly, the testimony that the defendant asked Malakov to bring Michelle to the park was properly admitted into evidence (*id.* at 635; *see United States v Annunziato*, 293 F2d 373 [1961], *cert denied* 368 US 919 [1961]).

The defendant further contends that the Supreme Court erred in allowing the attorney for the child, during the course of his testimony, to read to the jury Justice Strauss's oral decision removing temporary custody of Michelle from the defendant, and awarding temporary custody to Malakov. Although the jury was expressly instructed that "the decision of the judge has not been offered for the truth of the statements contained in the decision but rather . . . to establish the mere fact that they were made," the defendant maintains that the supposed impact of the statements upon her depended on the truth or falsity of the Supreme Court's factual findings and thus the jury had to consider the truth of the statements in order to evaluate the degree to which they had an impact upon her mental state. The defendant further contends that even if the statements were relevant, the prejudicial impact of the statements, which condemned her while praising Malakov's efforts to bond with Michelle, outweighed their probative value. We disagree.

In some instances, "[t]he mere utterance of a statement, without regard to its truth, may indicate circumstantially the state of mind of the hearer or of the declarant" (Prince, Richardson on Evidence § 8-106, at 502 [Farrell 11th ed]; *see People v Gibian*, 76 AD3d 583, 584 [2010]; *People v Cromwell*, 71 AD3d 414, 414 [2010]; *People v Rose*, 41 AD3d 742, 743 [2007]). Here, Justice Strauss's oral decision contained statements which were harshly critical of what he viewed as the defendant's efforts to sabotage visitation between Michelle and her father, and to prevent the child from developing a bond with him. However, the statements in the Supreme Court's decision were not offered for their truth and, indeed, it was unnecessary for the jury to consider the truthfulness and accuracy of these statements in evaluating their likely effect on the defendant's state of mind. Furthermore, the probative value of the statements

outweighed their prejudicial impact, because their impact on the defendant's state of mind was highly relevant circumstantial proof of her motive to have her husband killed. The fact that the justice presiding over the custody battle between the defendant and her husband voiced extremely negative views of the defendant's parenting skills in sua sponte taking temporary custody of Michelle away from her circumstantially supported the People's theory that the defendant believed that she might lose permanent custody of Michelle, and that she hired Mallayev to kill her husband to secure Michelle's return. Accordingly, Justice Strauss's decision was properly admitted into evidence for the purpose of establishing the defendant's state of mind upon hearing it (*see People v Gibian*, 76 AD3d at 585; *People v Cromwell*, 71 AD3d at 415; *People v Kass*, 59 AD3d 77, 86-87 [2008]; *People v Rose*, 41 AD3d at 743).

■ We also reject the defendant's contention that her right to testify in her own behalf and present a defense were violated when the Supreme Court sustained objections to questions, posed on direct examination, which asked her "why" she had taken certain actions. More specifically, the defendant argues that the Supreme Court's rulings prevented her from explaining why she taped a conversation with Mallayev in May 2007, why she violated the Sabbath by telephoning the Spy Shop on Saturday, October 27, 2007, and why she purchased a button camera from the Spy Shop that evening, thus impairing her ability to refute the prosecutor's assertion that she took these steps to protect herself should Mallayev later try to betray her. Even assuming the Supreme Court improvidently exercised the broad discretion with which it is entrusted in making evidentiary rulings (*see generally People v Carroll*, 95 NY2d 375, 385 [2000]), the defendant's constitutional rights to testify and present a defense were not curtailed because she was in fact permitted to convey her explanations for her actions to the jury. The defendant testified on both direct and cross-examination that she taped her May 2007 conversation with Mallayev to "document" her signature on a contract with his construction company to build a house in Georgia for her, and that she did not have a lawyer representing her in the transaction. Moreover, on cross-examination, she explicitly testified that not having a lawyer for the real estate transaction was "the reason" for documenting her signature. The defendant also explained during the course of her direct examination that her reason for purchasing the button camera was to document the October 28,

2007 meeting with her husband to pick up Michelle for visitation, as had been recommended by Michelle's therapist; she further explained on redirect examination that one of the visitation supervisors believed that use of a regular video camera to record the exchange of physical custody on October 22, 2007 had made that event more traumatic for the child, and that Michelle would not be able to see the button camera. The defendant's testimony also conveyed to the jury that she broke the Sabbath by telephoning the Spy Shop because she considered the purchase of the button camera to record the pickup of the child from Malakov to be an emergency. Defense counsel was able to utilize the testimony elicited from the defendant to argue on summation that she had offered a credible explanation for recording her conversation with Mallayev, and that her explanation that she purchased the button camera to record the pickup without upsetting Michelle was more credible than the People's claim that she purchased the button camera to record Malakov's murder.

█ Furthermore, the record does not support the defendant's claim that she was deprived of a fair trial, and deprived of the effective assistance of counsel, because her attorney was required to deliver his summation without adequate preparation time. The record reveals that during a conference which took place immediately after the defendant rested on the afternoon of Thursday, March 5, 2009, the Trial Justice turned to the issue of scheduling summations, and told the attorneys "we should be able to get in . . . two summations tomorrow." The defendant's attorney protested that it was his understanding, based on a conversation that the codefendant's attorney had had with the Supreme Court's principal law clerk, that summations would be delivered on Monday, March 9, 2009. The Trial Justice reminded the defendant's attorney that he had told him "every time we had a sidebar . . . we're going to sum up on Friday," noting "we are on a very tight schedule" and would be losing one alternate juror that day because she was leaving the country. Asked to estimate how long their summations would be, the defendant's attorney stated that he needed a "couple of hours," the codefendant's attorney stated that he needed 1¹/₂ to 2 hours, and the prosecutor stated that he needed 2 to 2¹/₂ hours. After extensive discussions, and after taking into account that the defendant's religious beliefs prohibited her from traveling after sundown on Friday evenings, the Trial Justice ultimately required the attorneys for the defendant and

codefendant to deliver their summations on the morning of Friday, March 6, 2009, and allowed the prosecutor to deliver his summation on the morning of Monday, March 9, 2009.

"[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial" (*Herring v New York*, 422 US 853, 858 [1975]), and the right to make a closing argument is codified in New York by CPL 260.30 (8), which provides that "[a]t the conclusion of the evidence, the defendant may deliver a summation to the jury." Contrary to the defendant's contention, her right to have her attorney present a closing argument was not infringed upon here. Although the defendant maintains that the summation schedule took her attorney by surprise, the record indicates that the Trial Justice had previously advised the attorneys of his intent to begin summations on Friday.

Moreover, while the trial was a lengthy one, the record indicates that the attorneys were provided with daily transcripts of much of the testimony, which should have assisted them in considering what points they would wish to make on summation before the close of testimony. The record also amply demonstrates that despite the alleged lack of adequate preparation time, the defendant's attorney, an experienced criminal defense lawyer, delivered a highly effective summation in which he highlighted the lack of direct evidence of the defendant's involvement in the murder, and attempted to persuade the jury that there were reasonable, innocent explanations for the conduct which provided circumstantial evidence of her guilt.

Nor was it an improvident exercise of discretion for the trial court to require summations to commence on the day after the close of testimony, rather than lose an entire working day, and impose additional hardship on jurors who had already been seated for six weeks, by unnecessarily extending the length of the trial. While the defendant suggests that the decision to proceed with summations on Friday, March 6, 2009, was improperly influenced by the Trial Justice's own travel plans, the record does not support such a claim. To the extent that the defendant asserts that the People were given an unfair advantage because the prosecutor had the entire weekend to prepare his summation, we note that the record indicates that the two defense summations were completed at approximately 3:30 P.M. on Friday, March 6, 2009. Given the fact that the jury had already heard two lengthy summations that day, and considering the time constraints imposed by the defendant's

religious beliefs, which the Trial Justice did not wish to pressure her to violate, the decision to have the prosecutor deliver his summation on the following Monday morning, rather than late Friday afternoon, was entirely proper.

█ The defendant additionally contends, relying upon the United States Supreme Court's decision in *Presley v Georgia* (558 US —, 130 S Ct 721 [2010]), that her right to a public trial was violated when the Supreme Court temporarily excluded observers, including the press and members of her family, from the courtroom during portions of the voir dire because there was available seating only for the 70 prospective jurors who were to be called into the courtroom at the beginning of each round. However, at no point during voir dire did the defendant raise any objection to the temporary closure of the courtroom. Accordingly, the defendant's claim that her right to a public trial was violated is unpreserved for appellate review (*see People v George*, 79 AD3d 1148 [2010], *lv granted* 16 NY3d 895; *People v Alvarez*, 76 AD3d 1098 [2010], *lv granted* 16 NY3d 827; *People v Varela*, 22 AD3d 264, 265 [2005]; *People v Vatansever*, 5 AD3d 406, 407 [2004]; *People v Mojica*, 279 AD2d 591, 592 [2001]; *cf. People v Garcia*, 95 NY2d 946, 947 [2000]), and we decline to review it in the exercise of our interest of justice jurisdiction (*see* CPL 470.05 [2]).

The defendant's argument that the evidence was legally insufficient to establish her guilt of murder in the first degree because there was no proof that she agreed to provide anything of pecuniary value to Mallayev in exchange for killing her husband is also unpreserved for review, since she did not raise this claim until she moved to vacate her conviction pursuant to CPL 330.30 (*see People v Padro*, 75 NY2d 820, 821 [1990]; *People v Joseph*, 74 AD3d 840 [2010]; *People v Stewart*, 71 AD3d 797 [2010]; *People v Greenlee*, 70 AD3d 966 [2010]; *People v Hutchinson*, 57 AD3d 565 [2008]). Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]). The defendant additionally failed to preserve for appellate review her constitutional challenges to the Supreme Court's refusal to hold a hearing to determine the reliability of the proposed fingerprint identification evidence presented at trial, and to the evidentiary rulings which limited the scope of the cross-examination of the People's fingerprint experts conducted by the codefendant's attorney (*see People v Sims*, 57 AD3d 1106, 1109 [2008]).

The defendant's remaining contentions are without merit. Accordingly, the judgment is affirmed.

MASTRO, J.P., DILLON and SGROI, JJ., concur.

Ordered that the judgment is affirmed.